## Roger R. Lussier v. North Troy Engineering Company, Inc. and Roger R. Lussier v. Saad Gabr

[544 A.2d 1173]

No. 85-089

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes,**[1] **JJ.**

Opinion Filed March 30, 1988

---

[1] Justice Hayes was present for oral argument but took no part in the decision.

*David C. Drew*, Lyndonville, for Plaintiff-Appellant.

*Zuccaro, Willis & Bent*, St. Johnsbury, for Defendant-Appellee Gabr and Defendant-Appellant North Troy Engineering, Inc.

**Gibson, J.** Plaintiff appeals from the trial court's granting of a directed verdict in favor of defendant Saad Gabr; defendant North Troy Engineering Co., Inc. (North Troy) cross-appeals from a jury verdict against it. We affirm the judgment entered by the trial court.

During the months of September and October of 1982, plaintiff entered into a contractual agreement with defendant North Troy, the precise terms of which are in dispute. Undisputed is the fact that plaintiff was hired to find a Vermont bank, the controlling interest of which could be purchased by North Troy at a price less than one and one-half times the bank's equity. As consideration for this service, plaintiff would receive a "finder's fee" of $50,000.

On December 12, 1982, plaintiff met with defendant Gabr, the sole stockholder of North Troy. During this meeting, the parties discussed the possible purchase of two banks, one of which was the Bradford Bank of Vermont. Plaintiff told Mr. Gabr he was concerned that North Troy would not have the financial ability to pay plaintiff the $50,000 finder's fee. Mr. Gabr thereupon orally assured plaintiff that if North Troy did not pay plaintiff, he would pay plaintiff.

Although there is no evidence that plaintiff ever met with the shareholders of any bank to ascertain that a deal could be made for the purchase of a controlling interest, plaintiff nonetheless alleges that he performed his part of the contract after the meeting

of December 12. He requested payment of his fee from North Troy, which refused the request. When Mr. Gabr refused a similar request, plaintiff then brought suit against both defendants.

At trial, at the close of plaintiff's case, the court directed a verdict in favor of Mr. Gabr on the ground that Mr. Gabr's oral promise to pay was unenforceable under the Statute of Frauds. Thereafter, the jury returned a verdict against North Troy.

## I.

In its cross-appeal from the jury verdict, North Troy maintains that there was insufficient evidence for the jury to ascertain the terms of the agreement between the parties; thus, the jury could not have determined whether plaintiff had fulfilled the agreement when he reported back that the Bradford Bank met all of the specified requirements and was available for purchase by North Troy at a price of one and one-quarter times equity. North Troy further maintains that even if the agreement required only that plaintiff locate a Vermont bank that North Troy could purchase, plaintiff did not "substantially perform" because the proposed sale was never put before the bank's shareholders for approval. In essence, North Troy contends that plaintiff never established that enough shareholders were willing to sell a controlling interest in the bank, and plaintiff therefore did not present sufficient evidence to support the verdict.

At the close of plaintiff's evidence and again at the close of all the evidence, North Troy moved for a directed verdict on the ground that the evidence was insufficient to support the plaintiff's allegations. The nub of the motion was that plaintiff could not have performed his part of the agreement until the question of whether to sell to North Troy had been submitted to the bank's shareholders and approved by those holding a majority of the shares of stock. It is undisputed that this question was never presented to or voted on by the shareholders of the Bradford Bank. North Troy received an adverse ruling on its motion by the trial court both at the close of plaintiff's evidence and again at the close of all the evidence. North Troy contends that the trial court erred, and now seeks the entry of judgment in its favor on the basis of its motion for directed verdict.

A.

■ To preserve for appeal a request for judgment pursuant to a motion for directed verdict, defendant must have filed a motion for judgment notwithstanding the verdict (n.o.v.) with the trial court. See *Johnson* v. *New York, N.H. & H.R.*, 344 U.S. 48, 50-54 (1952) (under Fed. R. Civ. P. 50(b),[2] appeals court could not enter judgment for defendant on arguments raised in its motion for directed verdict, absent motion for judgment n.o.v.); *Cone* v. *West Virginia Pulp & Paper Co.*, 330 U.S. 212, 218 (1947) (in absence of motion for judgment n.o.v., appellate court was without power to enter judgment contrary to jury verdict); see also 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2537, at 604 (1971) ("Judgment cannot be had as a matter of law, either after verdict or after a jury disagreement, in the absence of a motion for judgment.").

■ In the instant case, North Troy did not request judgment n.o.v. under V.R.C.P. 50(b). In the absence of such a motion, we may not enter judgment for North Troy, should we agree with its position. We are not necessarily precluded, however, from reviewing the trial court's ruling on the motion for directed verdict to determine whether there was error warranting reversal and a new trial. See *Lenard* v. *Argento*, 699 F.2d 874, 888 (7th Cir.), *cert. denied*, 464 U.S. 815 (1983) (failure of appellant to file motion for judgment n.o.v. or motion for new trial limits the relief available from the appellate court to that of possibly ordering a new trial) (citing *Cone*, 330 U.S. 212; 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 50.12 (2d ed. 1981)); see also *Railroad Dynamics, Inc.* v. *A. Stucki Co.*, 727 F.2d 1506, 1511 (Fed. Cir. 1984) (where no posttrial motions for judgment n.o.v. or new trial were filed

---

[2] V.R.C.P. 50(b) is identical to Fed. R. Civ. P. 50(b), and reads as follows:

> (b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. . . .

and appeal is directly from judgment entered on jury's verdict, review of sufficiency of evidence is extremely limited or nonexistent, prejudicial legal error must be shown to have occurred in conduct of trial, and action of appellate court is limited to affirmance or remand for new trial).

North Troy contends that, not only was the evidence insufficient, but there was, in fact, an absence of evidence that would warrant sending the case to the jury, because plaintiff never obtained a commitment from shareholders owning a majority of the shares of a bank that they would sell their stock to North Troy. In light of North Troy's contention that there was an absence of any evidence to support the verdict, we shall, in our discretion, review the issue, despite the lack of a motion for judgment n.o.v., to determine whether a new trial is warranted. See *Jones* v. *Reliance Ins. Co.*, 607 F.2d 1, 3-4 (D.C. Cir. 1979) (where appellant failed to move for judgment n.o.v., appellate relief was limited to ordering a new trial, and trial court's refusal to direct a verdict was ground for a new trial only if record revealed a complete absence of evidence to support jury's verdict).

### B.

Motions for directed verdict require a consideration of the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. *Sachse* v. *Lumley*, 147 Vt. 584, 586, 524 A.2d 599, 600 (1987). If there is any evidence fairly and reasonably supporting the nonmoving party's claim, the case should go to the jury, and a directed verdict would be improper. *Id.*

Viewing the evidence in the light most favorable to plaintiff, and excluding the effect of any modifying evidence, we find that the record discloses the following facts. In October 1982, an agreement was consummated between plaintiff and North Troy whereby plaintiff agreed to search for a Vermont bank that could be purchased by North Troy at a price not to exceed one and one-half times the bank's equity. Plaintiff was to pay his own expenses for all the preliminary work in finding such a bank. If successful, plaintiff was to be paid a finder's fee, or commission, of $50,000.

Plaintiff proceeded to investigate several possibilities, including the Caledonia Bank and the Bradford Bank. On December 12,

1982, he met with Mr. Gabr, who promised to pay plaintiff's commission if North Troy failed to do so. The next day, plaintiff met with the president of the Bradford Bank, who agreed to a sale of that bank to North Troy at a price of one and one-quarter times the equity. The bank president assured plaintiff there would be no difficulty in obtaining shareholder approval inasmuch as the bank had previously been offered for sale for less than that amount. On December 22, 1982, the bank president met with plaintiff, defendant Gabr, and the vice president of North Troy at Mr. Gabr's home in North Hatley, Quebec to confirm that North Troy's offer to purchase the Bradford Bank had been accepted.

On January 31, 1983, a meeting was held in Sherbrooke, Quebec, attended by plaintiff, Mr. Gabr, Mr. Gabr's Vermont attorney, Mr. Gabr's accountant, and the vice president of North Troy, to review the application form that was to be submitted to the Comptroller of Currency and finalize the date upon which a formal tender offer would be made to the bank. The application to the Comptroller of Currency was necessary in order to ensure that the prospective purchaser was qualified to own the bank's stock. At the January 31 meeting, it was decided that the application would be submitted to the Comptroller no later than March 1, 1983 and that the tender offer to the bank, together with a $100,000 deposit, would be made on April 1, 1983. At the meeting, it was left that the necessary information would be gathered and inserted on the application form by Mr. Gabr and his accountant, and the form would then be sent to Mr. Gabr's Vermont attorney for forwarding to the Comptroller of Currency. The completed application form was never received by Mr. Gabr's Vermont attorney, however, and he was given no further instructions relative to the transaction. No formal tender offer was ever made by or on behalf of North Troy to purchase the stock of the Bradford Bank.

Based on the foregoing facts, we conclude that there was evidence sufficient to support a finding that plaintiff fully performed his part of the agreement and that the projected sale fell through because of a failure on the part of North Troy to follow through on the agreement that had been negotiated. There was no error in the denial by the trial court of North Troy's motion for directed verdict.

## II.

In his appeal, plaintiff maintains that the trial court should not have dismissed Mr. Gabr from the case. The Statute of Frauds, as set forth in 12 V.S.A. § 181, provides in pertinent part:

> An action at law shall not be brought in the following cases unless the promise, contract or agreement upon which such action is brought or some memorandum or note thereof is in writing, signed by the party to be charged therewith or by some person thereunto by him lawfully authorized:
>
> . . . .
>
> (2) A special promise to answer for the debt, default or misdoings of another; . . . .

■ As a general rule, an oral promise to pay the debt of another is unenforceable under the Statute of Frauds if the original debtor remains liable after the promise is made. *Pike Indus., Inc.* v. *Middlebury Assoc.*, 136 Vt. 588, 593, 398 A.2d 280, 283 (1979); *Enos* v. *Owens Slate Co.*, 104 Vt. 329, 333, 160 A. 185, 187 (1932); *Conti* v. *Johnson*, 91 Vt. 467, 469-70, 100 A. 874, 875 (1917). Such an agreement is considered an extension of the original contract, and is sometimes known as a collateral agreement. In the instant case, defendant Gabr argues that his promise to pay the obligation if North Troy failed to do so is unenforceable inasmuch as North Troy remained liable under the original contract. The evidence indicates that defendant Gabr did not assume sole responsibility for the commission to be paid to the plaintiff. Instead, Mr. Gabr specified only that he would pay plaintiff if North Troy did not. North Troy was not discharged from the responsibility and continued to be responsible for the fee. Under ordinary circumstances, the promise of Mr. Gabr, to be enforceable, should have been reduced to writing. See *Pike Indus.*, 136 Vt. at 592-93, 398 A.2d at 282-83.

■ Plaintiff maintains, however, that Mr. Gabr's promise to pay was a separate agreement, not a promise to pay the debt of another, and because it was an original contract, it was an exception to the general rule and did not require a writing under the statute. See *Contractor's Crane Serv., Inc.* v. *Vermont Whey Abatement Auth.*, 147 Vt. 441, 447, 519 A.2d 1166, 1171 (1986) ("An *original* promise . . . is unaffected by the Statute, and thus can be oral.") (emphasis in original).

In determining whether a subsequent promise constitutes an original contract rather than a collateral promise to the original contract, we must look to see if there was "new consideration" to support the agreement. See *Johnson* v. *Estate of Samson*, 113 Vt. 38, 40, 29 A.2d 919, 920 (1943); *Cross* v. *Richardson*, 30 Vt. 641, 647-48 (1858). If "new consideration" exists, the contract is considered an original agreement. An element that must be present to establish "new consideration" is that "the consideration must be one that operates to the advantage of the [subsequent] promisor." *Estate of Samson*, 113 Vt. at 40, 29 A.2d at 920. Mr. Gabr was the sole stockholder of North Troy; consequently, plaintiff asserts, Mr. Gabr stood to benefit from the performance of the contract between North Troy and the plaintiff, and this constituted adequate consideration to support the promise. Plaintiff's argument overlooks the fact, however, that the benefit Mr. Gabr would receive was not new, nor was it altered by the subsequent oral promise. The subsequent promise did not benefit Mr. Gabr in any way that was not already established by the original agreement. Thus, it is clear that the promise did not constitute a separate or original contract. The trial court therefore acted correctly in granting the motion for directed verdict.

*Affirmed.*